United States Annuity & Life Insurance Company *v.* Peak.

Opinion delivered January 3, 1916.

1.  EVIDENCE—FRAUD—TESTIMONY AS TO CHARACTER.—Evidence of general reputation and good character is inadmissible to rebut imputations of fraud, in a civil suit; the transaction should be ascertained by its own circumstances, and not by the character of the parties.

2.  INSURANCE—PAYMENT OF PREMIUM—NOTE—ACCEPTANCE BY COMPANY. —A life insurance policy was delivered to the insured and he gave his note to the local agent in payment therefor, for the first year. The agent gave the same to a bank as collateral security for a loan, and with the proceeds of the loan paid the insurance company the amount of the premium due to it; the company accepted the amount sent as payment of the amount due. *Held,* there could thereafter be no forfeiture of the policy for non-payment of the premium for the first year, because the company had treated the premium as paid.

3.  LIFE INSURANCE—APPLICATION—COMPLETION OF EXAMINATION—DUTY TO DISCLOSE NEW MATTER.—Where an applicant for life insurance has done all that is required of him in making an application for a policy of life insurance, he is not, as a matter of law, before the delivery of the policy to him, required to disclose to the company the result of another medical examination for insurance in another company, as to his state of health, regardless of the fact whether he believed what he learned from the second examination or not.

4.  LIFE INSURANCE—PHYSICAL CONDITION OF APPLICANT—CONCEALMENT. —After deceased had made an application for a policy of life insurance in appellant company, and had done all that was required of him, but before the delivery of the policy, deceased learned that he had chronic Bright's disease. *Held,* his failure to disclose

that fact to appellant company amounted to an intentional concealment on his part, of a material fact, and his failure to communicate it to the company, avoided the policy.

Appeal from Chicot Circuit Court; *Turner Butler,* Judge; reversed.

### STATEMENT BY THE COURT.

Appellee sued appellant to recover on a life insurance policy. The appellant is a life insurance company organized under the laws of the State of Illinois, and is authorized to transact business in the State of Arkansas. On August 14, 1913, Robert F. Peak, of Readland, Arkansas, made application in writing to appellant for a policy of life insurance in the sum of $5,000, payable to his wife, Pearl S. Peak, as beneficiary. In his application he represented and agreed that his answers to questions propounded by the company's medical examiner should be true, and should be the basis of and the consideration for the contract of insurance applied for. On the same day Peak submitted to an examination by Dr. J. W. Nichols, the local medical examiner of the company. His medical examination, among other things, contained the following:

"Does the chemical examination of the party's urine show albumen or sugar (even in traces) or any abnormality?" "No."

Doctor Nichols did not obtain a specimen of the applicant's urine on the 14th. He asked Mr. Peak for a specimen, but Peak, having passed his urine before he went to the doctor's office, could not furnish it at that time. The doctor suggested that he would go to Mr. Peak's house the next day to get a specimen, but Peak said he might be gone. The next morning the doctor received a specimen of urine represented to be the urine of Peak. The specimen was delivered to the doctor by Mrs. Annie Peak, the applicant's mother. Doctor Nichols made a careful examination of the specimen of urine received by him from the applicant's mother on the morning of the 15th of August, 1913, and found it to be normal. He had

no reason to suspect, after such an examination, that Peak was afflicted with Bright's disease.

On the 17th day of August, 1913, Peak was examined by Dr. C. P. Meriwether, of Little Rock, Arkansas, for insurance in another company. Doctor Meriwether testified as follows:

Peak looked to be in good condition. An examination, however, showed that his blood pressure was much higher than that of a normal man and an examination of his heart showed an injured condition or hypertrophy. His urine was loaded with albumen and was of low specific gravity. I found no traces of sugar, but considerable albumen. I told Peak that he might have acute or chronic Bright's disease, and that he ought to go to his family physician, and that I could not tell much about it unless I should make a microscopic examination. At his request I then made a microscopic examination. I found all kinds of casts. I then told him I thought he had Bright's disease. He told me that he was going to Roswell, New Mexico, and I told him that he ought to be under medical treatment all of the time. We got a medical directory and decided upon a physician at Roswell to whom he should go for treatment. It is not a scientific and medical possibility that the urine of Mr. Peak could have been in a normal condition on the 15th day of August, 1913, in view of the condition I found on the 17th, taking into consideration the condition of his heart, coupled with what I discovered on the microscopic and chemical examination.

Mr. Peak's application for insurance in appellant company was finally accepted on the 5th day of September, 1913. His policy was signed on the 22d day of August, 1913, and was mailed to the State agent of the company in Arkansas on September 6, 1913. The policy was delivered to Mr. Peak by the local agent of the company on the 17th day of September, 1913. The company first received information of Mr. Peak's physical condition as disclosed by the examination made by Doctor Meriwether on the 16th day of September, 1913. Immediately after it received the information, on the 17th day of September, 1913, the company sent a telegram to its State agent to

hold the policy for further instructions. The State agent called the local agent over the telephone and directed him not to deliver the policy. The policy, however, had been delivered a few hours before by the local agent to Mr. Peak.

The insured died five months and two days after the policy was delivered to him, and Bright's disease of the kidneys caused his death. Mr. Peak executed a note for $151.40, payable to the order of J. L. Carter, the local agent of the company, for the first year's premium. The local agent and the State agent deposited this note as collateral security for money borrowed by them of a local bank. They remitted to the company its share of the proceeds. In other words, they paid to the company that part of the premium which went to it. The note in question provided that it should be paid in monthly installments, and the monthly installment due June 14, 1914, was not paid. The company went to the local bank where the note was deposited as security and paid the note. The note was returned to Peak by registered mail on June 29, 1914. He tried to pay it, but the agents of the company refused payment.

Peak made no disclosure to the insurance company of what Doctor Meriwether had told him concerning his physical condition. If he had made such disclosure, the company would not have issued the policy and delivered it to him.

Testimony was introduced on the part of the company tending to show that if Peak's condition on the 17th of August was as testified to by Doctor Meriwether, his urine could not have been normal on the 15th of August, 1913. Several physicians testified to this fact. A physician for appellee testified, however, that his condition might have been normal on the 15th, and that it was possible that there might have been a rise in his blood pressure in forty-eight hours at the end of which time casts might show.

Testimony was also adduced in favor of appellee tending to show that the specimen of urine furnished to

Doctor Nichols was genuine. Evidence was also introduced tending to show that the reputation of the insured for truth and morality was good.

The jury returned a verdict in favor of appellee, and the cause is here on appeal.

*L. A. Stebbins* and *X. O. Pindall,* for appellant.

1. The court erred in admitting evidence of the reputation of deceased for truth and morality. 62 Ark. 267; 35 S. W. 228; 3 Caines 120; 28 Kans. 756; 68 Ia. 737; 28 N. W. 47; 56 Am. Rep. 870; 30 Ore. 211; 46 Pac. 850; 6 Cow. 673; 16 Am. Dec. 460; 1 Gray (Mass.) 529; 38 Okla. 395; 132 Pac. 1092; 49 L. R. A. (N. S.) 724 and note, 725, 728.

2. It was the duty of deceased to disclose facts material to the risk known to him while his application was pending and before its acceptance and his failure to do so renders the policy void when issued by the company in ignorance of such fact. 1 Elliott on Contracts, § 125; 25 Cyc. 797; 1 May on Ins. (3 ed.), § 190; Richards on Ins. (3 ed.), § 100; Kerr on Ins., § 141; 130 Tenn. 325; 170 S. W. 474; L. R. A. 1915, C. 153.

3. The court erred in its application of the law to the fact of the nonpayment of the installment due on the premium note on January 14, 1914. 74 Ark. 507; 86 S. W. 813; 75 Ark. 25; 86 S. W. 814; 85 Ark. 337; 108 S. W. 213. So far as the note being payable to the local agent of the company is concerned, this precise question is settled in 75 Ark. 25; 86 S. W. 814.

4. A verdict should have been directed for appellant. 81 Ark. 568; 101 *Id.* 513; 101 Ark. 513.

*Baldy Vinson* and *W. G. Street,* for appellee.

1. The medical examiner was the agent of the company for that purpose and Peak had a right to rely on his report as to his condition, and in the absence of fraud, the defendant is bound by his report. 109 Ill. 157. Nicoll was the appellant's agent. 71 Ark. 295; 104 *Id.* 538; 5 Ga. App. 708; 96 Am. St. 698; 24 R. I. 7; 51 Atl. 1049; 17 L. R. A. (N. S.) 1144; 115 N. W. 500; 79 S. W. 219.

2. Nonpayment of the note given and accepted as payment after knowledge of the alleged facts disclosed, as grounds of forfeiture is no defense. 41 L. R. A. (N. S.) 505; 147 S. W. 882; 149 Ky. 80. The company owned the note and Carter, its agent, had the privilege of raising money by discounting or hypothecating the note; it belonged to the company, and it is estopped to deny payment, or set up nonpayment or any other ground than fraud. 149 Ky. 80; 41 L. R. A. (N. S.) 505. Giving credit for payment of a premium waives the provision in a policy that it shall not take effect until the premium is paid while the applicant is in good health. 197 Fed. 299; 128 Ga. 491; 128 L. R. A. (N. S.) 319.

3. Proof of good character may be made where one is charged with fraud. 62 Ark. 267; 25 Conn. 465.

Hart, J., (after stating the facts). (1) The cause was submitted to the jury on the theory that the main question of fact for their determination was whether or not the policy was obtained through fraud. The court instructed the jury that if the insured was affected with Bright's disease at the time he made the application, that such fact was material to the risk and avoided the policy if the insured either knew that fact or concealed it from the company, or purposely furnished the medical examiner of the company with a specimen of urine for examination which was not his own. The appellant, to maintain the charge of fraud, introduced considerable evidence tending to show that the specimen of urine examined by its medical examiner was a spurious specimen. The appellee then, by way of rebuttal, introduced witnesses who testified that they were acquainted with the general reputation of Peak for truth and morality in the neighborhood where he lived, and that that reputation was good. Counsel for appellant assigns as error the action of the court in admitting this testimony, and we think they are right. It is true there is some authority to the effect that in civil cases where a party is charged with fraud, and the charge is based only on circumstantial evidence, he may rebut the charge by proof of his good char-

acter. We think, however, the far safer rule is that in conformity to the general rules of evidence in civil cases each transaction should be ascertained by its own circumstances, and not by the character of the parties. See 16 Cyc. 1263.

In the case of *Great. Western Life Ins. Co.* v. *Sparks*, 38 Okla. 395, 132 Pac. 1092, 49 L. R. A. (N. S.) 724, the court held that in an action on a life insurace policy where one of the defenses set up in the answer was that the insured had falsely and fraudulently answered certain questions propounded to him in his application for insurance, it was error to admit evidence to the effect that the general reputation of the insured for being a truthful and honest man in the neighborhood in which he resided was good for the purpose of rebutting direct evidence tending to establish the allegation of fraud.

Many cases are cited in the opinion to sustain it and many others are cited in an extensive case note to the opinion as reported.

Then, too, we think this is the effect of our decision in the case of *Powers* v. *Armstrong*, 62 Ark. 267. See, also *Stone* v. *Hawkeye Insurance Co.*, 68 Iowa 737, 28 N. W. 47, 56 Am. Rep. 870; *Munkers* v. *Farmers and Merchants Insur. Co.*, 30 Oregon 211, 46 Pac. 850; *Fowler* v. *Aetna Fire Ins. Co.*, 6 Cow. (N. Y.) 673, 16 Am. Dec. 460.

(2)    It is also insisted by counsel for appellant that in any event the policy had lapsed for nonpayment of the installment due on the note on the 14th day of January, 1914. It will be remembered that the applicant executed a note for the first year's premium payable to the order of J. L. Carter, the local agent of the company. Carter, who was the local soliciting agent of the company at Eudora, Ark., and the State agent of the company deposited the note with a local bank as collateral security for borrowed money. Out of the proceeds, the agents paid to the company the amount due it out of the first year's premium and retained the amount of the commissions due them. The company accepted the amount sent it as payment of the amount due it; and there could thereafter be no for-

feiture of the policy for nonpayment of the premium for the first year because the company treated the premium as paid.

(3)   Finally it is insisted by counsel for appellant that it was the duty of the applicant to disclose facts coming to his knowledge material to the risk while the appellant company had his application for insurance under consideration and before its acceptance.   In short, they contend that it was his duty to disclose the fact that he had been told by Doctor Meriwether that he had chronic Bright's disease, and that his failure so to do avoided the policy.   They contend that the subject-matter of the contract is the life of the applicant, and that if, after the application had been made and representations forwarded to the insurer to induce them to enter into the contract, there is a change in the subject-matter of the contract, considerations of fair dealing require the applicant to disclose the change, that good faith requires the applicant to disclose to the company every fact material to the risk which came to his knowledge at any time before the contract was closed.   In support of their contention, they cite *Peidmont & Arlington Life Ins. Co.* v. *Ewing, Admr.*, 92 U. S. 377; *Harris* v. *Security Mutual Life Ins. Co.*, 130 Tenn. 325, 170 S. W. 474, L. R. A. 1915 C, 153.   Several cases are cited in the opinions in these cases in support of the rule, and other cases are cited in the case notes to which they refer.

We do not adopt the reasoning of these cases in their entirety.   We do, however, think the rule announced there was correct when applied to the facts of those cases.   For instance, in the case in 92 U. S. 377, while negotiations were still pending between the agent of the company and the applicant touching the terms of the contract, the amount of the premium and the mode of payment, a friend paid the premium to conceal from the agent the condition of the applicant, who was then *in extremis* and died in a few hours.   The agent, in ignorance of the facts, delivered the policy, and the court held that no valid contract arose from the transaction.   The court said:

"To hold that, when he was *in extremis,* an hour or two before he breathed his last, a friend could pay this small sum to an agent of the company, without the agent of the company having any idea of the condition of the dying man, and thus secure an obligation to pay his administrator $5,000 within sixty or ninety days, is to affirm that one party to a negotiation can delay his assent to the terms of the contract until the changes of fortune enable him to reap all the benefits, and throw all the losses on the other side, and then, for the first time, do what was necessary on his part to make the contract obligatory."

In the instant case the policy had not been issued, but the applicant had done all that had been required of him. We do not think he would be required, as a matter of law, to disclose to the company the result of a medical examination for insurance in any other company regardless of the fact whether or not he in good faith believed what the medical examiner had told him. For instance, when the applicant went to Doctor Meriwether and was examined by him for life insurance in another company, and Doctor Meriwether told him that he found albumen in his urine and other indications of Bright's disease, the applicant would not be required to state this fact to appellant company unless he believed it to be true; for, if he did not believe the statement made by Doctor Meriwether, he could not be said to conceal a material fact from the company. He might believe that his kidneys were only temporarily affected, and that the physician was mistaken in believing it to be Bright's disease.

(4)    The testimony in the case before us, however, went further than this. After Doctor Meriwether had examined him and told him that the results of the examination indicated that he had Bright's disease, Peak became alarmed. Doctor Meriwether told him that he could not tell much about it until he made a microscopic examination, and as a result of this examination told him he thought he had chronic Bright's disease. The applicant then told him that he intended to go to Roswell, New Mexico, at once, and Doctor Meriwether selected a physician to treat him for Bright's disease while he was out there.

Doctor Meriwether is a physician of good reputation, and there is nothing whatever in the record to dispute his testimony.

So, it may be said that the result of Doctor Meriwether's examination of the applicant was to disclose to him that he had a fatal disease, the presence of which he could not be ignorant of, and the failure to disclose his knowledge that he had chronic Bright's disease was an intentional concealment on his part of a material fact, and his failure to communicate it to the company avoided the policy. Under the undisputed facts, we think there was an element of knowledge on the part of the applicant that he had Bright's disease, and that there was an intentional concealment of this fact from the company.

For the reasons given in the opinion, the judgment will be reversed and the cause remanded for a new trial.